IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| MAURICE BULLOCK, #189070, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 2:15-CV-638-MHT |
| ) | |
| KENNETH JONES, et al., ) | |
| ) | |
| Defendants. ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

**I.  INTRODUCTION**

In the instant 42 U.S.C. § 1983 action, Maurice Bullock ("Bullock"), an indigent state inmate with severe, chronic mental health issues, argues that the decision of the Involuntary Medication Committee requiring his forced medication violates due process. Bullock also complains that the medical treatment provided to him for high blood pressure is inappropriate and challenges various actions taken against him by correctional officials.

This case is currently pending before the court on a motion for preliminary injunction filed by Bullock on October 15, 2015, in which he seeks issuance of an order "to halt all anti-psychotic or psychotropic meds until evaluated by a trained highly educated psychiatrist to figure what exactly is the plaintiff's current condition. The new claim is that the plaintiff is not schizoaffective disorder; bipolar type, and to be evaluated to find or discover the true diagnosis." *Doc. No. 49* at 2.  Bullock argues that the injunctive relief now sought is urgently needed because his current medication, Prolixin, "is causing the plaintiff to have

severe anxiety, and partial delusions[.]" *Id*. at 3.

The mental health defendants filed responses addressing the allegations set forth by Bullock in which they assert that Bullock is currently receiving necessary and appropriate care to stabilize his mental health condition. Upon review of the motion for preliminary injunction and the responses filed by the defendants, the court concludes that the plaintiff's motion for preliminary injunction is due to be denied.

## II. STANDARD OF REVIEW

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court... ." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).  This court may grant a preliminary injunction only if Bullock demonstrates each of the following prerequisites:  (1) a  substantial likelihood of success on the merits; (2) a substantial threat that irreparable injury will occur absent issuance of the injunction; (3) the threatened injury outweighs the potential damage the requested injunction may cause the non-moving parties; and (4) the injunction would not be adverse to the public interest. *Palmer*, 287 F.3d at 1329; *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998); *Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983); *Shatel Corp. v. Mao Ta Lumber and Yacht Corp.*, 697 F.2d 1352 (11th Cir. 1983).  "In this Circuit, '[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the "burden of persuasion"' as to the four requisites." *McDonald's*, 147 F.3d at 1306; *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (a preliminary

injunction is issued only when "drastic relief" is necessary); *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (grant of preliminary injunction "is the exception rather than the rule," and movant must clearly carry the burden of persuasion). The moving party's failure to demonstrate a "substantial likelihood of success on the merits" may defeat the party's claim, regardless of the party's ability to establish any of the other elements. *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994); *see also Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir. 2000) (noting that "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper"). "'The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated.' *Northeastern Fl. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fl.*, 896 F.2d 1283, 1284 (11th Cir.1990)." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001).

### III. DISCUSSION

In his response to the pending motion for preliminary injunction, Dr. Edward Kern, a board certified psychiatrist, asserts that the forced medication of Bullock is necessary to stabilize this inmate's severe mental illness. In support of this assertion, Dr. Kern states as follows:

> **Mental Health Care and Treatment of Inmate Bullock**
>
> I am familiar with Inmate Bullock and I have provided mental health care to him....

3

Inmate Bullock is a 47 year old man who has been incarcerated ... on a life sentence for murder since 1996. [He previously] describe[d] to me the events that led to [his] incarceration as follows: When he was 17 years old, "One day I started going crazy ... thinking about killing people ... I was thinking everyone was against me." He does not recall hearing voices. He thought others were "messing with me and I had to kill them before they kill me." He concluded that his then-girlfriend was using some means to influence or control him (he mentions her red dress). The relationship ended, and he says he shot and killed her new boyfriend.

In my capacity as a psychiatrist, I first met Inmate Maurice Bullock in 2003, at which time he had already been diagnosed with schizoaffective disorder, bipolar type, and was voluntarily taking the antipsychotic Prolixin Decanoate and the antidepressant Elavil.

In 2006, Inmate Bullock was moved to the [Residential Treatment Unit at Bullock], where I next saw him for clinical services in April, 2010 when I began working in that unit. At that time, I noted his diagnoses to be schizoaffective disorder (as before) and also panic disorder. One key feature of his illness is a lack of insight preventing him from being aware of the need for treatment.

His maintenance medications, taken with voluntary informed consent in 2006, included the antipsychotics Risperdal (4mg at night) and Thorazine (150mg twice daily), and the antidepressant/antianxiety agents Celexa and Vistaril, plus Benadryl. I noted that he had previously been tried on the antipsychotics Prolixin and Geodon, and the mood stabilizers Lithium Carbonate and Depakote, all limited by one or another reported side effect.

Later in 2010, he quit taking Risperdal, which was then stopped, after he reported some nipple enlargement. He remained on the Thorazine, but psychotic symptoms emerged several months later, and in May of the following year (2011) he got into an altercation with an inmate in the context of having psychotic misperceptions about the inmate. He soon refused to continue any psychiatric medications, and the psychosis worsened (including delusions about witchcraft affecting him, and of being sexually assaulted in his sleep, auditory hallucinations, and the sense that his thoughts were being broadcast for others to hear.) In October 2011, I determined he was no longer stable enough to remain in a dorm setting and he was admitted to the Stabilization Unit where he was housed in a single cell.

As he was overtly psychotic, lacked insight into his mental illness or need for treatment, and presented an ongoing risk of further aggression associated with psychotic misperceptions and beliefs, we petitioned for "involuntary medication" status, and this was approved on December 22, 2011.

He was then started on the long-acting injectable antipsychotic Prolixin Dec at 12.5mg [in] the Stabilization Unit, after efforts to motivate adherence with oral meds proved to be unsuccessful. In January 2012, I noted an "excellent initial response." He told me he was now able to use items like water or lotion without "worrying that someone has put something in it." He was more relaxed and conversed appropriately, although psychotic symptoms did persist at a lower level, including believing that other inmates in the dorm tried to make him "paranoid" by subtle means such as "swishing" air at him, and he also thought he had "telepathy and telekinesis."

Over the ensuing period of almost four years I (and at times a CRNP or another psychiatrist on our team) have worked extensively with him in an effort to find a medication regimen that would be both beneficial and well tolerated. For example, in 2012 we substituted the oral antipsychotic olanzapine (Zyprexa) for the injectable Prolixin Decanoate in an effort to address reported concerns about feeling slowed or restless (though he was also refusing oral medications--benztropine and amantadine--for these side effects). After several months he felt worse and wanted to resume the Prolixin Decanoate, which was done at the low dose of 12.5mg every two weeks. In November 2012 he asked to change to injectable Haldol Decanoate, recalling benefits some years previously from this antipsychotic. I started him on a low dose of 50mg monthly, and he reported that his ideas about "witchcraft" no longer made him so anxious, and he wanted to try a higher dose of 100mg but I suggested a more cautious increase to 75mg monthly as a first step.

By October 2013, he was showing enough improvement that the "Involuntary Medication Committee" that had reviewed his progress every six months elected to discontinue the "involuntary" order. Two months later, we transitioned to low-dose oral Haldol in an effort to reduce the restlessness (akathisia) that he was experiencing (while still refusing to try side-effects medications at the time to treat this). I soon noted the reemergence of paranoia, and he did consent to retry Prolixin Decanoate in an effort to control the psychosis before he lost insight.

After months of working with him in an effort to find a regimen he would adhere to, he quit taking all meds in 2014 (including his antihyperintensive meds, resulting in dangerously high blood pressures--up to 163/111--that he viewed without concern in association with being somewhat manic and feeling invulnerable.

### **Involuntary Medication**

On November 14, 2014, we petitioned to reinstate involuntary medication after he became aggressive toward another inmate afer being off antipsychotic medication for months. He was then restarted on Prolixin Decanoate and agreed to add the mood stabilizer Depakote in an effort to control manic behavior, with some calming effect, though on December 8, 2014 he wrote a document explaining his "gifts" as including "super genius." He soon refused to continue the Depakote.

Throughout this year (2015) he has remained on Prolixin Dec that we again lowered in an effort to maximize his tolerance, but he deteriorated back into over psychosis, and recently required a brief time in a single cell. The need for ongoing "involuntary" medication status was reviewed and approved by the facility's Involuntary Medication Review Committee at 90 day and 180 day intervals since being reinstated in 2014. The Committee's last review of Inmate Bullock was in August, 2015. At that time, the Committee determined Inmate Bullock should continue involuntary administration of Prolixin.

The Committee's next review of involuntary administration of psychotropic medication to Inmate Bullock will take place in [the 180 day interval in] February of [2016].

### **Placement in "Segregation"**

In his Motion for Injunctive Relief, Inmate Bullock states that I placed him in "seg". "Seg" is a term used by the ADOC for segregating inmates for disciplinary or administrative purposes. The mental health Stabilization Unit (SU) is used at times by ADOC to house inmates for disciplinary or administrative purposes. However, I have never placed Inmate Bullock in the SU or a crisis cell for disciplinary or administrative purposes. As outlined below, my placement of Inmate Bullock in the SU and crisis cells was for a medical/mental health purpose.

Note that admissions to a crisis cell are for short-term observation and stabilization that may be followed by return to the dorm, or may lead to longer term SU admission.

Inmate Bullock had no SU or crisis cell admissions in 2013.

His first SU admission in 2014 was during the period November 10th through November 19th. He was admitted to a crisis cell after an altercation with another inmate. He argued that he did not have any mental health problem, and that he had "slapped" the man who he said was "a person in my organization ... Gangster Disciples ... a secret society... He was supposed to go on a mission." [Inmate Bullock] exhibited delusional thinking and an inappropriate affect. He had also been irrationally refusing his blood pressure [medication] for months despite dangerously high BP measurements (for example 174/106 on 11/16/14). We requested a committee hearing to consider reinstituting an "involuntary medication" order which is discussed above.

On November 19, 2014 Inmate Bullock was moved from a crisis cell to an SU admission, and he began receiving involuntary medications as noted above. He remained there until December 3, 2014.

On December 3, 2014 he was discharged from the SU to the Residential Treatment Unit (RTU)/Level 2. During this time he remained housed in a single cell on the SU per "level 2" protocol, but went to the RTU area for daily groups and activities. He appeared to be relatively stable and free of mania or delusional thinking so he was transitioned back to the RTU residential dorm on January 5, 2015.

On January 28, 2015, Inmate Bullock told me that he quit taking lithium citing vaguely defined ill effects, and he declined to try simply lowering the dose. He was again exhibiting hypomania and his insight into the need for treatment was impaired. We continued to extensively discuss treatment options with the goal of seeking a tolerable balance between benefits and side effects. We continued to work with him over the ensuing six months using low doses of medication in an effort to find an acceptable treatment strategy.

On Sunday, July 12, 2015, Inmate Bullock was admitted via telephone order to be placed in a crisis cell on the SU after presenting with manic features, including that he "felt like he could pick up the building." He also reported

drinking a lot of soda, possibly containing caffeine. By July 13, he was calm enough to be discharged back to the RTU dorm.

On August 25, 2015, [Inmate Bullock] was placed in a crisis cell after multiple clinicians reported concerns over increasing signs of psychosis, and he had been described as angry and agitated with another inmate in the dorm, but reporting being "gifted" to me and refused to discuss medication adjustment. On August 28, 2015, he was discharged back to the RTU dorm once he spoke more rationally and stated a willingness to "work w/ you" on his medication.

On September 3, 2015, Inmate Bullock was placed in an SU cell for housing on "level 2" due to manic-like behavior, including keeping other inmates up at night in the dorm and "inappropriate comments to female staff" leading to his counselor having to terminate their session that day. [Inmate Bullock] lacked insight and could not see how his behavior presented a problem. He felt he was being treated unfairly. He also acknowledges drinking a lot of coffee (despite previous discussions of the need to moderate this, as it could worsen his symptoms). He was discharged from SU on September 8, 2015.

On September 22, 2015, I saw Inmate Bullock in the RTU. He told me that he "took crazy 101 class in college ... also psychiatry 1000... We should talk sometime!" He added that "... they sent students to a psychiatric hospital for 10 years to learn how to fake crazy." Though hypomanic and somewhat irrational, he was allowed to return to the RTU dorm. However, later that day I was called to the RTU for an emergency reevaluation, where I found Inmate Bullock sitting in a chair, exhibiting rambling speech. An officer was concerned that he was about to end up in an altercation with other inmates. He was admitted to a crisis cell to provide a safe environment. On September 24th, he returned to the RTU dorm where he has remained since.

All of Inmate Bullock's SU and crisis cell admissions were medically necessary and within the standard of care.

## **Second Opinion**

In a recent court filing, I understand Inmate Bullock has requested that involuntary administration of anti-psychotic or other psychotropic medications be ceased until he is evaluated by a trained highly educated psychiatrist.

8

Inmate Bullock currently suffers from schizoaffective disorder, bipolar type. This is a severe, chronic and disabling mental illness. Inmate Bullock has been evaluated by two trained and highly educated psychiatrists, Dr. Hunter and me. He has also been evaluated over his years of incarceration by several other psychiatrists, all of whom have documented the presence of severe mental illness.

As noted above, I am a board certified psychiatrist licensed to practice medicine in the State of Alabama....

. . .

Obtaining a "second opinion" by an non-ADOC affiliated psychiatrist (or additional opinion from any other psychiatrist) is not medically necessary and is [in my opinion] not required by the applicable standards of care.

### Side Effects

In a recent court filing, I understand Inmate Bullock claims Prolixin is causing him to have severe anxiety and partial delusions.

Prolixin is not causing Inmate Bullock's delusions. Prolixin has been prescribed to treat his delusions and severe mental illness.

Although patients taking Prolixin and other similar medications can experience restlessness and anxiety as a side effect (called akathisia), the medical benefit of Prolixin and other similar medications outweigh the medical risks. In fact, Inmate Bullock has shown a benefit from Prolixin. He has had fewer delusions and has functioned more appropriately in the correctional setting when taking a sufficient does of Prolixin or equivalent antipsychotic medication.

### Expert Psychiatric Opinions

The following are my medical opinions as a board certified psychiatrist concerning Inmate Bullock:
a.  Inmate Bullock suffers from a severe, chronic and disabling mental illness.
b.  Inmate Bullock poses a threat to himself and others making it necessary to involuntarily administer psychotropic medication to him.
c.   Involuntary administration of Prolixin, an antipsychotic medication, is

> medically necessary for the treatment of Inmate Bullock's serious mental illness and is in Inmate Bullock's best interest.
> d. Since Inmate Bullock has not been cooperative with treatment, involuntary administration of Prolixin is currently necessary and in Inmate Bullock's best interests.
> e. If involuntary administration of Prolixin were discontinued, Inmate Bullock likely would become a danger to himself and others.
> f. Involuntary administration of Prolixin is the least restrictive means of treating Inmate Bullock's serious mental illness.
> g. Continued involuntary administration of Prolixin will 1) Help prevent Inmate Bullock from becoming a danger to himself and others, and 2) Help him recover to the point at which he can function in a dorm or similar setting.

*Exh. 1 to the Mental Health Care Providers' Response - Doc. No. 63-1* at 1-7 (paragraph numbering omitted).

Dr. Robert B. Hunter, Jr., a board certified psychiatrist and the Medical Director for Mental Health Management Services, provides the following additional information in addressing Bullock's claims:

> I am ... Chairman of the Involuntary Medication Review Committee at Bullock County Correctional Facility. As Chairman, I attend Involuntary Medication Review Committee meetings at Bullock County Correctional Facility approximately once per month. I am not otherwise engaged in providing direct day-to-day psychiatric care to inmates at Bullock County Correctional Facility.
>
> I did not provide day-to-day psychiatric care to Inmate Bullock. My role with respect to Inmate Bullock was limited to reviewing requests for the administration of involuntary psychotropic medications to him. However, I have reviewed Inmate Bullock's psychiatric records and I am familiar with the psychiatric care he received while at Bullock County Correctional Facility.
>
> I have also reviewed Dr. Kern's affidavit submitted with his Special Report to the Court. I agree with Dr. Kern's assessment of Inmate Bullock and his expert opinions.

## **Involuntary Review Committee's Consideration of Administration of Involuntary Medication of Inmate Bullock and Dr. Hunter's Expert Psychiatric Opinion Concerning Inmate Bullock**

On November 14, 2014, I participated in an Involuntary Medication Review Committee meeting with Inmate Bullock. During this meeting I reviewed Inmate Bullock's psychiatric records. I discussed administration of involuntary medication with Inmate Bullock. I also discussed the matter with the other two Committee members-a psychologist and a registered nurse.

It was my expert opinion, as a licensed psychiatrist in the State of Alabama, that as of November 14th:
a.   Inmate Bullock suffered from a severe, chronic and disabling mental illness.
b. Inmate Bullock posed a threat to himself and others making it necessary to involuntarily administer psychotropic medication to him.
c. Involuntary administration of Prolixin, an anti-psychotic medication, was medically necessary for the treatment of Inmate Bullock's serious mental illness and was in Inmate Bullock's best interest.
d.  Since Inmate Bullock was not cooperative with treatment, involuntary administration of Prolixin was necessary and in Inmate Bullock's best interests.
e.  Involuntary administration of Prolixin would 1) Help prevent Inmate Bullock from becoming a danger to himself and others, and 2) Help him recover to the point at which he can function in a dorm or similar setting.
f.  Involuntary administration of Prolixin was the least restrictive means of treating Inmate Bullock's serious mental illness.

Therefore, on November14th, I authorized involuntary administration of Prolixin to Inmate Bullock....

On February 17, 2015, Dr. Kern requested the Committee authorize the continued involuntary administration of medication to Inmate Bullock.

On February 19, 2015, I participated in the Involuntary Medication Review Committee's review of the administration of involuntary medications to Inmate Bullock.  During this meeting I reviewed Inmate Bullock's psychiatric records. I discussed administration of involuntary medication with Inmate Bullock.  I also discussed the matter with the two other Committee members-a

psychologist and a registered nurse.

It was my expert opinion, as a licensed psychiatrist in the State of Alabama, that as of February 19th:

a.   Inmate Bullock suffered from a severe, chronic and disabling mental illness.
b.  Involuntary administration of Prolixin, an anti-psychotic medication, was medically necessary for the treatment of Inmate Bullock's serious mental illness and was in Inmate Bullock's best interest.
c.  Continued involuntary administration of Prolixin was necessary and in Inmate Bullock's best interests.
d. If involuntary administration of Prolixin were discontinued, Inmate Bullock likely would become a danger to himself or others.
e.  Involuntary administration of Prolixin would 1) Help prevent Inmate Bullock from becoming a danger to himself and others, and 2) Help him recover to the point at which he can function in a dorm or similar setting.
f.  Involuntary administration of Prolixin was the least restrictive means of treating Inmate Bullock's serious mental illness.

Therefore, on February 19th, I authorized the continued involuntary administration of Prolixin to Inmate Bullock....

On August 20, 2015, Dr. Kern requested the Committee authorize the continued involuntary administration of medication to Inmate Bullock.

On August 20th, I participated in the Involuntary Medication Review Committee's review of the administration of involuntary medications to Inmate Bullock. During this meeting I reviewed Inmate Bullock's psychiatric records. I discussed administration of involuntary medication with Inmate Bullock. I also discussed the matter with the two other Committee members-a psychologist and a registered nurse.

It was my expert opinion, as a licensed psychiatrist in the State of Alabama, that as of August 20th:

a.   Inmate Bullock suffered from a severe, chronic and disabling mental illness.
b.  Involuntary administration of Prolixin, an anti-psychotic medication, was medically necessary for the treatment of Inmate Bullock's serious mental illness and was in Inmate Bullock's best interest.
c.  Continued involuntary administration of Prolixin was necessary and in

>Inmate Bullock's best interests.
>
>d. If involuntary administration of Prolixin were discontinued, Inmate Bullock likely would become a danger to himself or others.
>e. Involuntary administration of Prolixin would 1) Help prevent Inmate Bullock from becoming a danger to himself and others, and 2) Help him recover to the point at which he can function in a dorm or similar setting.
>f. Involuntary administration of Prolixin was the least restrictive means of treating Inmate Bullock's serious mental illness.
>
>Therefore, on August 20th, I authorized the continued involuntary administration of Prolixin to Inmate Bullock....
>
>The Committee's next review of involuntary administration of psychotropic medication to Inmate Bullock will take place in February 2016.

*Exh. 3 to the Mental Health Care Providers' Response - Doc. No. 63-3* at 1-4 (paragraph numbering omitted) (citations to exhibits omitted).

Dr. Hunter further agreed with Dr. Kern's opinion that there is no need for an additional opinion on Bullock's diagnosis. *Id*. at 4. Dr. Hunter also stated that it is his "expert opinion ... that the involuntary administration of Prolixin to Inmate Bullock should continue." *Id*. With respect to Bullock's allegations regarding the side effects of Prolixin, Dr. Hunter maintains that "Prolixin is not causing Inmate Bullock's delusions.... Although patients taking Prolixin ... can experience anxiety as a side effect, the medical benefit of Prolixin and other similar medications outweigh the medical risks. In fact, Inmate Bullock has shown a benefit from Prolixin. He has had fewer delusions and has functioned more appropriately in the correctional setting when taking a sufficient dose of Prolixin or equivalent antipsychotic medication." *Id*.

Turning to the first prerequisite for issuance of preliminary injunctive relief, the court finds that Bullock has failed to demonstrate a substantial likelihood of success on the merits of his claims. Bullock likewise fails to establish a substantial threat that he will suffer the requisite irreparable injury absent issuance of the requested preliminary injunction; instead, it is clear to the court that under the current circumstances entry of the injunction sought by the plaintiff likely would be detrimental to his mental health. In denying Bullock's request for a temporary restraining order seeking termination of the administration of all anti-psychotic medication, both voluntary and involuntary administration, the District Judge came to a similar conclusion. *Order of November 2, 2015 - Doc. No. 64* at 2 ("[A]s the court lacks the specialized knowledge required to make decisions about the plaintiff's medical treatment, it would not be in the plaintiff's best interest (and, indeed, would present a serious risk of being harmful to him) for the court to grant his request for a temporary restraining order at this time."). The third factor, balancing potential harm to the parties, weighs more heavily in favor of the defendants as issuance of the injunction would adversely impact the ability of mental health personnel to provide inmates with treatment which they deem necessary in accordance with their professional judgment. Finally, the public interest element of the equation also appears to weigh in favor of the defendants at this juncture. Thus, Bullock has failed to meet his burden of demonstrating the existence of each prerequisite necessary to warrant issuance of preliminary injunctive relief.

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1. The motion for preliminary injunction filed by the plaintiff on October 15, 2015 be DENIED.

2. This case be referred back to the undersigned for additional proceedings.

It is further

ORDERED that on or before November 23, 2015, the parties may file objections to the Recommendation. Any objections filed must specifically identify the factual findings and legal conclusions in the Magistrate Judge's Recommendation to which the plaintiff objects. Frivolous, conclusive or general objections will not be considered by the District Court.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE, this 9th day of November, 2015.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE